**BEER NUTS, INC., Plaintiff,**

v.

**CLOVER CLUB FOODS COMPANY,
Defendant.**

**Civ. No. NC 79–0082.**

United States District Court,
D. Utah, N. D.

April 20, 1981.

**396**

Craig S. Fochler and Robert M. Newbury, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., Robert Mallinckrodt, Mallinckrodt & Mallinckrodt, Salt Lake City, Utah, for plaintiff.

Stephen H. Anderson, Ray, Quinney & Nebeker, Salt Lake City, Utah, R. William Johnston, Richard D. Seibel, Christie, Parker & Hale, Pasadena, Cal., for defendant.

## MEMORANDUM OPINION

JENKINS, District Judge.

This is an action for trademark infringement and unfair competition with a counterclaim asking that the plaintiff's registered mark be declared void and struck from the Trademark Registration Rolls.

Jurisdiction is footed on 15 U.S.C. § 1121, 28 U.S.C. § 1338(a), 28 U.S.C. § 1338(b) and 28 U.S.C. § 1332 and is found present. Venue is proper.

Plaintiff Beer Nuts, Inc., asserts that defendant's use of the term "Brew Nuts" and a drawing of an overflowing stein on packaging used in the sale of a sweet and salted peanut, is a colorable imitation of plaintiff's registered mark "Beer Nuts" and infringes on plaintiff's rights under federal, state and common law.[1]

Plaintiff asks that defendant's use of the term "Brew Nuts" and the overflowing stein symbol be enjoined. Plaintiff further seeks an accounting, damages for prior infringement as well as attorneys fees and costs. By way of defense, defendant asserts that the registration of "Beer Nuts" was fraudulent, that the registration rolls should be revised by striking the registra-

---

1. 15 U.S.C. § 1114 provides in part as follows:
(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection *with which such use is likely to cause confusion*, or to cause mistake, or to deceive, or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive. shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive. (Emphasis added).

tion from the rolls, and that it be determined that the term used (Beer Nuts) is generic or descriptive in nature and is incapable of exclusive use by plaintiff.[2]

Each party vends a sweetened and salted red-skinned peanut. Plaintiff also sells cashews. Plaintiff vends all of its nut products under the name "Beer Nuts". The bulk of each product sold by each party is sold in super markets, although plaintiff vends its products in and through a wide band of outlets including taverns and beer halls throughout the continental United States.

While a multitude of questions were presented to the Court, the question of genuine importance to the parties in this case is whether there is a likelihood of confusion[3] by the purchasing public as to the *source* —that is to say, the origin—of the competing products of plaintiff and defendant.[4]

■■ According to weight of authority such a determination is a question of fact.[5] The policy footings justifying one having a publicly sanctioned monopoly of a mark used in trade are traditionally stated as (1) minimizing the likelihood of public confusion as to the origin or source of goods marketed under the mark, and (2) precluding another from *unfairly* appropriating to himself the good will and the good name— the potential and repeat business—to which

the mark owner is rightfully entitled as a result of his expenditure of energy and effort in creating a mark with public recognition and acceptance.[6] In short, in the world of commerce and trade, no one ought to be allowed to trade on another's good name or trade on another's recognized mark.[7]

There are some symbols including some words—generic in nature—which because of their early and widespread use or their particular form are incapable of exclusive appropriation by one who wishes to use them as his own private mark in the very public world of trade and commerce.

The defendant here suggests that included in such a class of symbols are those words currently used by plaintiff—Beer Nuts—and based in part thereon by way of counterclaim asks this Court to strike "Beer Nuts" from the Register of Marks maintained by the Commissioner of Patents.

Plaintiff counters by relating a compelling story of plaintiff and its predecessors' dream of commercial success come true by the exploitation of the humble red-skinned peanut, delicately salted, ingratiatingly glazed by corn syrup and coconut oil and labeled, "with a bit of deviltry", "Beer Nuts". The principal product marketed under that label has achieved national acceptance resulting in current sales of about a million dollars per month.

---

**2.** A *generic* term can never become a trade mark. *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75 (7th Cir. 1977). For an excellent discussion of fundamental concepts see *Soweco, Inc. v. Shell Oil Company*, 617 F.2d 1178 (5th Cir. 1980).

**3.** See n. 1, *supra*.

**4.** *Beatrice Foods Co. v. Neosho Valley Cooperative Creamery Association*, 297 F.2d 447 (10th Cir. 1961) at 448 states:

"The test is whether the similitude in the labels would probably deceive a purchaser who exercises ordinary prudence, not the careless buyer who makes no examination."

**5.** *The Durox Company v. Duron Paint Manufacturing Company*, (CA 4) 320 F.2d 882, 74 Am.Jr.2d, § 119 p. 780.

**6.** See *American Steel Foundries v. Robertson*, 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317; *The Standard Oil Co. v. Standard Oil Company*, (C.A.Wyo.1958), 252 F.2d 65, 76 A.L. R.2d 600.

**7.** The policy has long been recognized. In dictum in a 1617 case in the Court of King's Bench, Doderidge cited a case in 1589 brought in the Court of Common Pleas by a clothier, "that whereas he had gained great reputation for his making of his cloth, by reason whereof he had great utterance to his great benefit and profit, and that he used to set his mark to his cloth, whereby it should be known to be his cloth: and another clothier perceiving it, used the same mark to his ill-made cloth on purpose to deceive him, and it was resolved that an action did well lie." *Southern v. How*, 79 Eng. Rep. 1243 (K.B.1617).

While there may be a lingering question as to whether the mark should have been registered at all, there is no question that since registration in 1955, there have been large expenditures of time, effort and money in giving the mark "Beer Nuts", a life of its own—i. e., widespread identification, acceptance, recognition and credence in the market place—in short, a secondary meaning.

Beer Nuts, Inc. is the owner of the Beer Nuts mark. It licenses the use of the mark to family controlled distributors who purchase the product from a family controlled processor. The salting and sweetening process was originally patented. The patent has expired.

The home office of Beer Nuts, Inc., as indicated on each package of product, is Bloomington, Illinois. The product is marketed in a variety of packages from vacuum packed tins to "see-thru" cellophane bags. The words "Beer Nuts" appear prominently near the top of a typical package. The printing is red on a white background or white on a red background. There is a variety of red and white striping at the top and bottom of the bags always with ®, the registration notice in juxtaposition to the words "Beer Nuts". There is a legend on the bag which states, "Distributed by Beer Nuts, Inc., Bloomington, Ill. 61701." A typical package is annexed.

Defendant packages and distributes a similar product, namely a red-skinned sweet and salted peanut in a partially "see-thru" bag, partially colored brown of various shades, with the logo "Clover Club" in the upper left hand corner, a drawing of an overflowing stein, and the words "Brew Nuts" set in brown on an orange background near the top of the package. In smaller type below the words "Brew Nuts" are the words "sweetened salted peanuts". On the reverse side, similar words appear. In the lower left hand corner of the typical package it states, "Clover Club Foods Company, General Offices, Kaysville, Utah 84037, 'Plants throughout the West'." A typical package is annexed.

▪ Is there a likelihood of confusion as to *origin of* the competing products? I find there is not.

While the peanut product is similar and the markets overlap in those areas of the United States where Clover Club Foods Company operates, (generally the Intermountain West), the product packaging and wording are sufficiently unique so as to preclude any likelihood of confusion as to the *origin of* the competing products.

*First*, the home office of each vendor is plainly stamped on each package: Bloomington, Illinois and Kaysville, Utah, respectively. The distinctive logo of each is prominently displayed—plaintiff's Beer Nuts, Inc.® and defendant's distinctive Clover Club mark used by it on hundreds of products.

*Second*, the color scheme of the package is readily distinguishable as is the unique design of each package. The eye of this Court is not confused, nor is the eye of the consuming public likely to be.

*Third*, the term Beer Nuts® as displayed on plaintiff's products performs at least three discreet functions: (1) It identifies the source of the goods. Beer Nuts, Inc. is the name of the originating company; (2) It refers to the product inside the package—usually a sweet and salted peanut, and (3) It describes or suggests use or purpose.

The term "Brew Nuts", in contrast, has but two discreet functions: (1) It refers to the product inside the package; and (2) It suggests or describes purpose or use.

Source or origin of product is indicated by the Clover Club logo confirmed by home office identification, all as set forth on the package.

▪ A suggestive or descriptive term which has acquired a secondary meaning as to origin or source of goods is entitled at best to protection limited to its *secondary* meaning. Such limited protection does not preclude another from using a descriptive term for purposes of description. This is particularly so when no confusion is likely

to occur as to origin or source of goods. Otherwise a descriptive term which is part of the general pool of language, much like the air we breathe to which all should have reasonable access, may be monopolized by one to the deprivation and detriment of all.[8]

■ When one appropriates a common term for use as a mark to indicate origin or source one takes the word subject to its use by others for purposes of suggestion or description. Such descriptive use is neither an infringement nor is it unfair. Such use is merely a continuation of the common use to which the word was put when the use as a mark began. Its use as a mark in the view of this Court is always subject to its prior common use.[9]

"Brew" is a descriptive term with a broader parameter than beer. As a descrip-tive term "brew" includes beer—but not *just* beer; it comprehends any concocted mixture and particularly one which results from fermentation without distillation.[10]

While defendant suggests the cultural demography of its market area expands the parameter of the word "brew" even more, I can't bring myself to seriously find that "brew" is *commonly* used in defendant's market area to refer to a cup of hot milk or a demi-tasse of Mormon tea.

■■ Even though this case was tried to the Court for three days and even though the exhibits run into the hundreds, the pivotal question still remains, are the terms used so similar that the public is likely to be confused as to the origin of product. For reasons outlined herein, I find they are not so similar nor is the public likely to be

---

8. *Dawn Donut Company, Inc. v. William T. Day, dba Daylight Donut Flour Company*, 450 F.2d 332, at p. 333 (10 Cir. 1971). Brew Nuts is not a registered mark. But even when comparing competing marks, "the test is whether the marks are sufficiently similar to deceive an ordinarily prudent buyer—not a careless buyer who makes no examination. *Ph. Schneider Brewing Co. v. Century Distilling Co.*, 10 Cir., 107 F.2d 699, 704. In applying this test we have held that there is no confusing similarity between 'Meadow Sweet' and 'Meadow Gold,' *Beatrice Foods Co. v. Neosho Valley Cooperative Creamery Association*, 10 Cir., 297 F.2d 447, or between 'Mother's Best' and 'Mother's Pride,' *Nebraska Consol. Mills Co. v. Shawnee Milling Co.*, 10 Cir., 198 F.2d 36. The similarity is no greater in the case at bar.

In our opinion a visual examination of the marks by a reasonably careful person would distinguish the products of the contending parties. We agree with the Trademark Trial and Appeal Board and with the district court that there is no likelihood of confusion, mistake, or deception." *Id.*

9. *General Adjustment Bureau, Inc. v. General Insurance Adjustment Company*, D.C., 258 F.Supp. 535, at 538 (1966): "Descriptive terms applicable to all in the same business may not be appropriated by one person or firm exclusively so that the use of the term itself would make it unfair competition. Such terms are not indicative of particular goods or services, but of their nature. To permit exclusive appropriation of such terms would be to permit monopolization of a common term and would constitute an infringement upon common speech." This is also fortified by 15 U.S.C.A. § 1115(b)(4), which states in part as follows: "That the use of the name, term, or device charged to be an infringement is a use, otherwise than as a trade or service mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party, or their geographic origin."

10. *Webster's Third International Dictionary* (1971 ed.) defines "brew" as follows: "A beverage formed by brewing; a drink of such beverage (as coffee or tea); also: a glass of beer; a product of brewing: mixture, concoction, batch; the process of brewing or being brewed." At 275. "Beer" is defined as: "A malted and hopped somewhat bitter alcoholic beverage; such a beverage brewed by bottom fermentation—compare Ale, Bock Beer, Lager, Porter; a carbonated nonalcoholic or a fermented slightly alcoholic beverage with flavoring derived from roots and other plant parts—used chiefly in compounds; fermented mash; a drink of beer." At 197.

See also *Encyclopaedia Britannica, or a Dictionary of Arts and Sciences* (Edinburgh, MDCCLXXI) at p. 665, "Brewing"—an old but fascinating article.

See *Bloor v. Falstaff Brewing Corp.*, D.C., 454 F.Supp. 258 at 260 for a brief general discussion of beer. *See also* BEER, 10 C.J.S., p. 226, for the multitude of names affixed to varieties of beer. But, in common talk, coffee may be brewed; tea is brewed; storms and trouble brew.

confused as to origin of product. If confusion is remotely possible although not likely, when one takes a term from the common pool of language and endeavors to appropriate it exclusively to one's own use to designate origin or source of goods, one takes that term subject to the fact that others may in good faith continue to use that term or related terms for descriptive or suggestive purposes, and for that purpose the risk of remotely possible confusion must be born by the late arriving appropriator from the common pool of language. See generally *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 117, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938) ("shredded wheat"). Even as to lawfully registered descriptive marks supported by effective efforts establishing their secondary meaning, the courts have held that one cannot appropriate a unique term descriptive of a product and deny others its use, as in the use of "cola" in describing beverages containing extract of the cola nut, *e. g., Dixi-Cola Laboratories, Inc. v. Coca-Cola Co.*, 117 F.2d 352 (4th Cir. 1941), or the use of "aloe" to describe a cosmetic containing the gel of the aloe vera plant. *American Aloe Corp. v. Aloe Creme Laboratories, Inc.*, 420 F.2d 1248 (7th Cir. 1970). The plaintiff's theory ranges far beyond these cases. Here, the plaintiff seeks not only to confirm an exclusive right to use "Beer Nuts" as a mark but to appropriate the entire pool of descriptive terms covering sweetened, salted peanuts suggested for consumption with beer or other "brew". While "Beer Nuts" and "Brew Nuts" were certainly pulled from the same descriptive pond, they are clearly not one and the same fish.

A similar problem was resolved by the United States Court of Appeals for the Seventh Circuit in *Hesmer Foods, Inc. v. Campbell Soup Company*, 346 F.2d 356 (1965). There the plaintiff, vendor of a cooked bean product under the mark "Beanee Barbecue", sought an injunction and damages against Campbell's for the marketing of a similar product called "Barbecue Beans". Denying relief, the Court commented,

> Campbell's use of the words "barbecue beans" is not a trademark but rather a description of its product, that is, beans in a barbecue sauce suitable for use at a barbecue.... Certainly the granting of the trademark "Beanee Barbecue" did not convey to plaintiff a monopoly for preparing beans for barbecues....

*Id.*, 346 F.2d at 358.

Likewise, Clover Club's use of the words "Brew Nuts" is a description of its product rather than a trademark, and recognition of the mark "Beer Nuts" does not convey a monopoly for preparing sweetened and salted peanuts for use with beer or other beverage, nor does it invest the power in Beer Nuts, Inc. to keep any other vendor from describing a similar product.[11] Beer Nuts, Inc. retains its right to use its specific and unique mark on its products to the exclusion of others, but the scope of the law's protection extends no farther.

■ I conclude relief must be denied in all aspects to plaintiff. Defendant's counterclaim to strike the name Beer Nuts from the registration rolls is also denied.

This opinion shall constitute Findings of Fact and Conclusions of Law in accordance with Rule 52 F.R.C.P. Each party to bear his own costs and attorneys fees.

Let Judgment be entered in accordance with Rule 58 F.R.C.P.

---

11. The general product concept involves melding the sweet, salty, nutty flavor of the product with the somewhat bitter taste of beer, rendering the latter more enjoyable. But see, Oliver Wendell Holmes, *Natural Law*, in Collected Legal Papers (1921) at 312: "Deep-seated preferences cannot be argued about—you cannot argue a man into liking a glass of beer—and therefore, when differences are sufficiently far-reaching, we try to kill the other man rather than let him have his way. But that is perfectly consistent with admitting that, so far as appears, his grounds are just as good as ours."

EXHIBIT I

EXHIBIT II

INGREDIENTS, REDSKIN PEANUTS ROASTED WITH PEANUT AND/OR COCONUT OIL. SUGAR. MALTO-DEXTRIN, ECITHIN AND SALT ADDED. SALT CONTAINS CITRIC ACID, TRICALCIUM PHOSPHATE, PROPYL GALLATE AND CORN OIL TO PRESERVE FRESHNESS.

CLOVER CLUB FOODS COMPANY
GENERAL OFFICES
NAYSVILLE, UTAH 84037
"PLANTS THROUGHOUT THE WEST"
REG. U.S. PAT. OFF.

